# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Civil Action No. 1:16-02442 (TFH)** |
| | ) | |
| **ONE GOLD RING WITH CARVED** | ) | |
| **GEMSTONE, AN ASSET OF ISIL,** | ) | |
| **DISCOVERED ON ELECTRONIC** | ) | |
| **MEDIA OF ABU SAYYAF,** | ) | |
| **PRESIDENT OF ISIL ANTIQUITIES** | ) | |
| **DEPARTMENT;** | ) | |
| | ) | |
| **ONE GOLD COIN FEATURING** | ) | |
| **ANTONINUS PIUS, AN ASSET OF** | ) | |
| **ISIL, DISCOVERED ON** | ) | |
| **ELECTRONIC MEDIA OF ABU** | ) | |
| **SAYYAF, PRESIDENT OF ISIL** | ) | |
| **ANTIQUITIES DEPARTMENT;** | ) | |
| | ) | |
| **ONE GOLD COIN FEATURING** | ) | |
| **EMPEROR HADRIAN AUGUSTUS** | ) | |
| **CAESAR, AN ASSET OF ISIL,** | ) | |
| **DISCOVERED ON ELECTRONIC** | ) | |
| **MEDIA OF ABU SAYYAF,** | ) | |
| **PRESIDENT OF ISIL ANTIQUITIES** | ) | |
| **DEPARTMENT;** | ) | |
| | ) | |
| **ONE CARVED NEO-ASSYRIAN** | ) | |
| **STONE STELA, AN ASSET OF ISIL,** | ) | |
| **DISCOVERED ON ELECTRONIC** | ) | |
| **MEDIA OF ABU SAYYAF,** | ) | |
| **PRESIDENT OF ISIL ANTIQUITIES** | ) | |
| **DEPARTMENT;** | ) | |
| | ) | |
| **ONE GOLD BROOCH WITH** | ) | |
| **A CAMEO OF MINERVA, AN ASSET** | ) | |
| **OF ISIL, DISCOVERED ON** | ) | |
| **ELECTRONIC MEDIA OF ABU** | ) | |
| **SAYYAF, PRESIDENT OF ISIL** | ) | |
| **ANTIQUITIES DEPARTMENT;** | ) | |
| | ) | |

**ONE GOLD NECKLACE WITH A** )
**COIN FEATURING EMPEROR** )
**GORDIAN III, AND A MATCHING** )
**BROOCH WITH AN INSET,** )
**UNDECORATED STONE,  AN ASSET** )
**OF ISIL, DISCOVERED ON** )
**ELECTRONIC MEDIA OF ABU** )
**SAYYAF, PRESIDENT OF ISIL** )
**ANTIQUITIES DEPARTMENT;** )
)
         **Defendants.** )

## UNITED STATES' AMENDED VERIFIED COMPLAINT
## FOR FORFEITURE *IN REM*

COMES NOW, plaintiff, the United States of America (the "United States" or "Government"), by and through the United States Attorney for the District of Columbia, pursuant to 18 U.S.C. § 981(a)(1)(G)(i) to bring this amended verified complaint for forfeiture in a civil action *in rem* against antiquities that are foreign assets of the Islamic State of Iraq and the Levant ("ISIL"), which were identified in the Abu Sayyaf raid (the "Defendant Properties"), and alleges as follows.

## NATURE OF ACTION AND THE DEFENDANT *IN REM*

1. This civil action *in rem* is brought against the Defendant Properties, which are depicted in the below photographs.

2. Through this amended complaint, the United States seeks forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(G)(i), of all right, title, and interest in the Defendant Properties, which are forfeitable as foreign assets of ISIL and as foreign assets affording a source of influence, as ISIL has and is engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      Venue is proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2), because the property subject to forfeiture is located in a foreign country.

## STATEMENT OF FACTS

5.      On October 15, 2004, al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, was designated as a Specially Designated Global Terrorist Organization under Executive Order ("E.O.") 13224.  On May 15, 2014, AQI's designation was amended to add the alias "Islamic State of Iraq and Syria" as its primary name, as well as other aliases.  On September 21, 2015, the Secretary of State added the following aliases to the ISIL listing: Islamic State, ISIS, and ISIL.  ISIL has called for numerous terrorist attacks in Syria and Iraq, as well as other parts of the world, including the United States.

6.      ISIL currently controls, or has recently controlled, large swathes of land in Syria and Iraq.  This includes multiple United Nations Educational, Scientific and Cultural Organization ("UNESCO") World Heritage Sites and other sites that contain archaeological and ethnological materials that are important to the cultural heritage of the people of Syria and Iraq.  Law enforcement has learned that ISIL has created a sophisticated system for extracting wealth from these resources.

7.      The United States conducted a raid against Abu Sayyaf, a notorious ISIL leader, near Deir Ezzor, Syria in May 2015.  The United States recovered data, including documents and photographs, from electronic media during this raid.  These documents revealed a significant amount of information about the organizational structure of ISIL and Abu Sayyaf's position within the network.  *See* Attachment A.

8.      Specifically, these documents reveal that ISIL generates a significant portion of its revenue from its control of territory and has established formal governance structures for extracting wealth from territory under ISIL control.  One of the departments ISIL established to extract wealth from its territory is the Ministry of Natural Resources, Department of Antiquities ("Antiquities Department").  In multiple documents written on ISIL letterhead, Abu Sayyaf referred to himself as the President of this Department.  *See* Attachments B-1 to B-5, and C.

9.      As described in more detail below, documents discovered in the Abu Sayyaf raid give additional insight into how Abu Sayyaf and his subordinates exploited areas under ISIL control.  Receipts reveal that extortion payments were often in U.S. dollars.  *See* Attachments B-2, B-3, and B-5.

10.      There were multiple antiquities that were found to be in Abu Sayyaf's possession during the raid.  *See* Attachment D.  Those antiquities were seized, and later returned to the Government of Iraq.  Many of the antiquities seized at the time of the raid appeared to have been in the process of being sold internationally.  For example, the antiquities were cleaned and maintained in a manner consistent with the preparation for sale.  Moreover, as further described below, Abu Sayyaf's electronic media had multiple photographs of other antiquities.  These photographs were staged in a manner consistent with the sale of antiquities.

## I.      ABU SAYYAF CONTROLLED ISIL'S ANTIQUITIES TRADE AS THE PRESIDENT OF ISIL'S DEPARTMENT OF ANTIQUITIES.

11.      ISIL leadership described Abu Sayyaf's expertise in the field of antiquities and managing the people trafficking these items.  *See* Attachment E.

12.      Documents additionally indicate that Abu Sayyaf considered excavation sites located in ISIL-controlled areas to be the property of the Antiquities Department.  Abu Sayyaf retained the means to enforce the policies he enacted, including by having the ability to arrest

individuals excavating archeological objects without authorization from the Antiquities Department.  *See* Attachments C and E.

13.     In one document, Abu Sayyaf issued an order to ISIL militants operating checkpoints.  *See* Attachment C.  The order permitted a subordinate to dig for archaeological objects in ISIL territories, supervise others involved with excavating those objects, and arrest anyone who excavated in ISIL-controlled areas without authorization from the Antiquities Department.  Other documents written by Abu Sayyaf indicated that violations of this order were strictly enforced.

14.     Documents from the raid indicate that Abu Sayyaf extorted persons who excavated or sold antiquities in ISIL-controlled territory, and also considered antiquities that simply passed through ISIL-controlled territory as falling under his purview.  *See* Attachments E and F.  For example, in one document the Vice President of the Antiquities Department stated that merchants had purchased 12 shandaras (black stamps or seals), four silver bracelets, one ruby, and a number of different coins.  *See* Attachment F.  The Vice President appears to have sent this document to Abu Sayyaf to receive clarification whether a 20% extortion fee should be applied to the items these merchants purchased and resold.  *See* Attachment F.

15.     Multiple documents indicate that the Antiquities Department levied a 20% tariff on the sale of antiquities.  *See* Attachments B, E, and F.  Moreover, the Antiquities Department also issued permits to allow excavators to exploit Syria's archaeological heritage.  *See* Attachment G.

## II. ABU SAYYAF ORDERED HIS SUBORDINATE TO KIDNAP A MINOR IN AN ATTEMPT TO EXTORT $50,000 - $130,000 FROM ANTIQUITIES MERCHANTS.

16.     One of the recovered documents is a transcript of a decision by the ISIL General Supervising Committee on a case filed by local antiquities merchants against Abu Sayyaf and his subordinate, Abu Layth.  *See* Attachment H-1 and H-2.  The merchants testified that Abu Layth attempted to collect 20% of the purchase price of archeological objects and gold in their possession.   The merchants additionally testified that they believed the items to be worth $120,000 - $180,000; however, Abu Layth testified that these items were valued at $200,000.  See Attachments H-1-H-2.  Abu Layth only offered $70,000 to the merchants for these items. *See* Attachment H-1.  Thus, Abu Layth attempted to extort approximately $50,000 - $130,000 from these merchants.

17.     Victim 1, the minor child of one of the merchants, testified before the ISIL General Supervising Committee.   He claimed that Abu Layth, armed with a pistol, and four other individuals, kidnapped him.  Victim 1 stated that Abu Layth said "we will not let him go until the gold comes!"  Victim 1 indicated that Abu Layth took him to an apartment, during which time Abu Layth's relative put a pistol to his head.

18.     The transcript indicates that Abu Layth also testified before the ISIL General Supervising Committee.   The transcript shows that the items in dispute were valued at $200,000 by mediators who communicated with merchants in Turkey.  *See* Attachment H-2. Abu Layth testified that Abu Sayyaf had knowledge of all Abu Layth's dealings.  See Attachment H-2.

19.     Abu Layth testified that Abu Sayyef ordered Abu Layth to kidnap Victim 1.  Abu Layth additionally testified that his relative who put a pistol to Victim 1's head worked for the ISIL Ministry of Natural Resources.

20.     In the findings of the case section, the ISIL General Supervising Committee tasked the ISIL Ministry of Natural Resources to sell the relics and to retain the 20% fee.  See Attachment H2.  The Committee previously stated in its opening remarks that the 20% fee was to be deposited into "the Treasury."  See Attachment H1.

21.     "[T]he Treasury" is a reference to a centralized depository of finances belonging to ISIL, from which ISIL pays its operational expenses.  These expenses include paying for activities, including its propaganda calling for attacks against others, including terrorist attacks against United States citizens.

## III.     ABU SAYYAF RECEIVED $211,060 FROM A SINGLE SUBORDINATE EXTORTING ANTIQUITIES EXCAVATIONS.

22.     Abu Layth testified that Abu Sayyaf gave him a receipt book, and that Abu Sayyaf signed this receipt book with a red stamp.  *See* Attachment H-2.  A receipt book was discovered in the raid of Abu Sayyaf's compound.  *See* Attachments B-1 to B-5.  Three of these receipts show that Abu Sayyaf collected $211,060 (in U.S. Dollars) as a 20% extortion fee.  *See* Attachments B-2, B-3, and B-5.

23.     In one receipt dated March 21, 2015, Abu Sayyaf acknowledged receiving $161,000 from Abu Layth for the 20% fee.  *See* Attachment B-2.

24.     In another receipt dated March 26, 2015, Abu Sayyaf acknowledged receiving $40,000 from Abu Layth for the 20% fee.  *See* Attachment B-3.

25.     In another receipt dated December 15, 2014, Abu Sayyaf acknowledged receiving $10,060 from Abu Layth, noting that the payment was for "20% of relics' value," and stating that the item was sold in an ISIL-controlled province in Syria.  *See* Attachment B-5.

26.     The seized receipts make clear that these payments were in U.S. dollars and that the amount paid corresponded to 20% of the sale price of the antiquities.  These three receipts

alone indicate that, Abu Layth, at the direction of Abu Sayyaf, extorted $211,060 from persons excavating antiquities.

## IV.  ABU SAYYAF SOLD ANTIQUITIES DIRECTLY, IN ADDITION TO EXTRACTING REVENUE BY EXTORTING EXCAVATORS AND RESELLERS.

27.     Abu Sayyaf's antiquities trafficking directly financed ISIL.  In a document written on ISIL letterhead and signed by Abu Sayyaf as the President of the Antiquities Department, Abu Sayyaf asked another ISIL member to transfer an archaeological object to him.  *See* Attachment I. Abu Sayyaf indicated that he wanted to sell the archaeological object and would transfer the proceeds derived from the sale of the object to the Treasury.  *See* Attachment I.  As stated above, the Treasury is the centralized depository of finances belonging to ISIL, from which ISIL funds its terrorist activities.

## V.  ISIL TRAFFICKED NUMEROUS ANTIQUITIES OUT OF DURA EUROPOS.

28.     Since early 2014, ISIL has maintained a strong foothold across Deir ez-Zor, including the site of Dura Europos, which is within Deir ez-Zor.  ISIL's Antiquities Department claimed the right to derive revenue from newly looted antiquities, previously looted antiquities, which included seized caches of antiquities stored in Deir ez-Zor looted by other groups, and gathered information on previously smuggled antiquities from that area, which they used to extort profits from locals connected to these networks.

29.     On January 28, 2014, the Syrian Directorate General of Antiquities and Museums (DGAM) reported that the looters were using "electronic devices," and had apparently uncovered "frescos [sic], pottery, stone statues, silver and bronze coins and gold items (bracelets, rings)." The illegal excavations occurred all over the site, including at: the necropolis outside the fortification walls, the Military Temple, the Temple of Bel, the Temple of Azzanathkona, the Temple of Artemis, the Temple of Adonis, the House Church, the Synagogue, the House of Lysias,

the Tower tombs, and the Private Villas. Looters were subsequently observed used earth-moving

equipment and drilling machinery.  A report comparing satellite imagery from September 4, 2011,

April 2, 2014, and June 3, 2014 found that by April 2014, the entire site of Dura Europos was

severely affected by looting such that large sections of the site were completely unrecognizable.

In or about February 2015, ISIL militants occupying Dura Europos were encouraging locals to

excavate the site by providing permits that taxed them at 30 percent of the monetary value of any

discoveries.  In satellite imagery from April 11, 2015 looting is visible to the west of the city wall

and on the eastern side of the site, close to the Citadel Palace in areas that had previously been

untouched.

30.     As described below, several defendant properties were excavated from Dura

Europos.

## **DEFENDANT PROPERTIES**

31.     Abu Sayyaf's electronic media had a number of images of antiquities.   The

documentary style, lighting, and focus of the photographs indicate that these images were prepared

for marketing in order to sell the photographed items internationally.

32.     Through law enforcement's investigation, additional information was discovered

regarding these photographed items.  These items, which constitute the "Defendant Properties,"

were identified as being connected to ISIL's antiquities trade.

## VI.     DEFENDANT PROPERTY 1 -- GOLD RING WITH CARVED GEMSTONE.

33.     Abu Sayyaf's hard drive had an image created in November 2014 of a gold ring, pictured here ("Defendant Property 1"):



34.     At that time, Abu Sayyaf was actively enforcing ISIL's claims on excavations at archaeological sites.  This ring has an oval shaped dark green gem in a bezel (groove holding the stone of a gem in its setting) setting.  The gold band is decorated with "C" shaped scrolls flanking the bezel. The gemstone is serpentine, carved on the front with an image of a crowned bust (depiction of a person's head, shoulders and chest) in profile facing left.  The crown is turreted (has tower-shaped objects).  The head possibly depicts a turreted and veiled goddess named Tyche (the daughter of Greek gods Aphrodite and Zeus or Hermes).

35.     This item is from the Hellenistic/Roman period, which dates to approximately 330 B.C. - 400 A.D.  The ring appears to be in excellent condition with no significant breaks or damage.  There is no visible soil adhering to the gem or setting in the image from Abu Sayyaf's electronic media.

36.     Through its investigation, law enforcement obtained an earlier image of this ring, prior to its being trafficked by ISIL.  A side-by-side comparison of the two photographs reveals that both photographs depict the same ring.  The earlier image showed soil embedded in the carving of the inset gem, reflecting in part that it had recently been excavated.  The ring displayed general signs of use and wear, including fine scratches and abrasions.  The differences between these photographs indicate that the ring was enhanced for international sale after the first photograph was taken.

37.     The investigation revealed that the ring came from a larger set of jewelry in Deir Ezzor, Syria.  As previously stated, the raid against Abu Sayyaf occurred near Deir Ezzor, Syria. The investigation further revealed that this set previously sold for $260,000.

## VII.    DEFENDANT PROPERTY 2 -- GOLD COIN FEATURING ANTONINUS PIUS.

38.     Hundreds of coins were seized during the raid of Abu Sayyaf's compound. See Attachment C.

39.     Abu Sayyaf's hard drive had an image created in November 2014 of an ancient Roman gold coin pictured here ("Defendant Property 2"):



40.     Abu Sayyaf was actively enforcing ISIL's claims on excavation sites in and around November 2014.  This coin was of aureus denomination, which means that it was a gold coin used in ancient Rome.  The aureus was regularly issued from the 1st century B.C., to the beginning of the 4th century A.D.

41.     One side of this coin features a bust of Antoninus Pius facing right wearing a laurel wreath. Beginning to the lower left of the bust, the visible inscription in Latin reads, "ANTO . . . G PIVSPPTRPXI," (Antoninus Augustus Pius Pater Patriae ["Father of the Country"], Tribunicia Potestas XI Tribunician [Power for the 11th time]).  The reverse side features the Roman goddess of generosity, Liberalitas, facing left, holding a cornucopia in her left hand.  The inscription includes the letters "LIB" to the left of the figure, and around the border beginning in the lower left, "COS IIII" (Consul for the 4th time).

42.     This coin is Roman, dates to approximately 138 - 161 A.D., and may be sourced to any large, urban Hellenistic or Roman city in Syria, including Apamea, Palmyra, Dura Europos, or Bosra.  This coin has general signs of use and ancient wear, including abrasions.  Like Defendant Property 1, Defendant Property 2 appears to be in excellent condition with no significant damage, and there is no visible soil adhering to the surfaces.  This item appears to have been cleaned in preparation for international sale.  Many similar trafficked coins are sold via the illicit market.

## VIII.  DEFENDANT PROPERTY 3 -- GOLD COIN FEATURING EMPEROR HADRIAN AUGUSTUS CAESAR.

43.     Abu Sayyaf's hard drive had another image created in November 2014 of an ancient

Roman gold coin, also of aureus denomination, pictured here ("Defendant Property 3"):



44.     One side of this coin features a bust of Emperor Hadrian Augustus Caesar, facing

right, and wearing a laurel wreath. There is a visible inscription in Latin, which begins to the lower

left of the bust, and reads, "HADRIANVS AV . . . TUS," (Hadrian Augustus).  The other side

features a she-wolf standing right, suckling the twins Romulus and Remus.  The inscription around

the border, beginning on the left, above the wolf reads, "COS III" (Consul for the 3rd time).

45.     This coin is Roman, dates to approximately 125 - 128 A.D., was probably minted

in Rome, and may be sourced to any large, urban Hellenistic or Roman city in Syria, including

Apamea, Palmyra, Dura Europos, or Bosra.  Defendant Property 3 has general signs of use and

ancient wear, including abrasions.  This item appears to have been cleaned in preparation for

international sale.   Like Defendant Property 1 and Defendant Property 2, Defendant Property 3

appears to be in excellent condition with no significant damage, and there is no visible soil

adhering to the surfaces.  As noted above, many similar coins are sold via the illicit market.

## IX.     DEFENDANT PROPERTY 4 -- CARVED NEO-ASSYRIAN STONE STELA.

46.     Abu Sayyaf's cellular phone contained an image created on or about August 2014

of the upper portion of a round-topped stone stela (upright stone slab bearing a relief design) carved

in relief with the image of a provincial official, most likely a eunuch, facing left, with his right

forearm and hand raised in a standard gesture, pictured here ("Defendant Property 4"):



47.     This photograph was found in Abu Sayyaf's electronic media, in a folder used by

the WhatsApp application.  Abu Sayyaf received this photograph from one of his subordinates,

based on the metadata location associated with the photograph and Abu Sayyaf's position in the

ISIL Department of Antiquities.

48.     This item has ten rows of carved inscriptions, written in cuneiform, which is an

ancient Middle Eastern script, on the lower portion of the stela on the official's skirt. The upper

edge of the stela is rounded and there is a raised border along the perimeter; the lower edge of the

stela is a continuous horizontal break from the left to right side with the lower portion entirely missing. The stone appears to be yellowish to light brown in color.

49.     The inscription on Defendant Property 4 may be translated as: "To the god Samnuha . . . , to whom it is good to pray, who dwells in the city . . . , the great lord, his lord: for the life of Shalmaneser (III), king of Assyria, his lord, Samas-abuya, governor of the cities Assur, Nasipina, Urakka, Masaka, Nabula, Kahat, Sura, Tidu, Sadikanni, Bursamina, Na[.]"  According to the inscription, which is largely legible due to the quality of the photographs, the stela is understood to depict a local governor named Shamash-abuya. This governor dedicated his stela to a local god, Samnuha, in the hopes that Shalmaneser III (859 - 824 B.C.), king of the Assyrian Empire, would be healthy.  This was a typical gesture for a local governor to have made to his overlord.  This item is believed to be from the archaeological site of Tell Ajaja in the Khabur region of northern Syria, based on the list of cities mentioned in the text of the stela, the dedication to the deity Samnuha, and the list of cities mentioned in the text.  ISIL has controlled much of the Khabur region in Syria and multiple groups have documented extensive looting at Tell Ajaja through sites visits and analysis of satellite imagery.

50.     The surface of the stela is moderately worn, particularly along the edges and upper portion of the figure.  The surface is mottled overall with dark brownish/black colored material that may be soil or perhaps biological staining, which would be typical of archaeological stone buried in proximity of decomposing biological materials such as roots and vegetation.  Tidelines of white colored material, most likely soluble salts, are present around the central portion of the front, indicating repeated cycles of wetting, drying, and/or changes in relative humidity.

51.     Several areas of the stone appear in the image to have more saturated color, indicating that the stone was wet and/or damp when the photograph was taken, which is

corroborated by nearby pooling of water and soil in the photographs.  Since the lower portion that contains the inscription appears damper than the upper portion, it is possible that the stela was wetted to highlight the contrast of the inscription, making it more legible for the photograph.  A layer of surface dirt may have been reduced with water, suggesting that the item was photographed shortly after being removed from an archaeological site.  Defendant Property 4 has an estimated value of between $30,000 and $50,000.

## X.  DEFENDANT PROPERTY 5 -- GOLD BROOCH WITH A CAMEO OF MINERVA OR ATHENA.

52.   Abu Sayyaf's cellular phone contained an image created on or about November 2014 of a gold brooch with a cameo of Minerva, or possibly Athena, pictured here ("Defendant Property 5"):



53.   Defendant Property 5 is an authentic antiquity that was produced in the third century A.D. by the same workshop that supplied similar items to elite residents of Roman Dura Europos, according to experts in archaeology and art history who have analyzed this image.  The cameo was found to be similar to a 3rd century A.D. Roman cameo discovered at Goito, Italy and

now in the Museo Archeologico Nazionale di Mantova.  The subject of the Goito cameo is identified as Athena.

54.     The cameo of Defendant Property 5 is mounted in a gold brooch setting that was found to be very similar to a gold brooch excavated at Dura Europos adjacent to the Roman Palace and is now in the National Museum of Damascus.  Both Defendant Property 5 and the brooch from Dura Europos now in the National Museum of Damascus share a particular arrangement of gold wire decoration.  The similarity between the two gold mounts leads experts to conclude that both were made in the same workshop and found at Dura Europos.

55.     In order to make hollow beaded wire decoration, the purity of the gold must be high — 22 carat or over.  Defendant Property 5 has an estimated value of $30,000 based on the high level of purity of the gold within it and the known offering prices for similar items.

## XI.     DEFENDANT PROPERTIES 6 AND 7 -- GOLD NECKLACE WITH A COIN FEATURING EMPEROR GORDIAN III AND A MATCHING BROOCH.

56.     Abu Sayyaf's cellular phone contained an image created on or about November 2014 of a Roman brooch with an inset, undecorated semi-precious stone ("Defendant Property 6"), gold necklace with a mounted coin of Roman emperor Gordian III ("Defendant Property 7"), and a Roman gold ring ("Defendant Property 1"), pictured here:



57.     Defendant Properties 6 and 7 are believed to have come from the Syrian archaeological site of Dura Europos.

58.     Experts in the field of archaeology and art history have analyzed this image and concluded that the items are authentic antiquities that were produced in the third century A.D. by the same workshop that supplied similar items to elite residents of Roman Dura Europos. Defendant Property 6 appears to be a brooch with an undecorated stone.  Defendant Property 7 appears to be an authentic Roman gold coin of aureus denomination mounted in a gold setting with a bronze clasp.  The obverse or "heads" side of the coin is visible in the image and features a bust of Roman Emperor Gordian III facing right and wearing a laurel wreath. There is a legible inscription in Latin, which begins toward the lower left of the bust and reads, "IMP GORDIANVS PIVS FEL AVG". This coin dates to approximately 238-244 A.D., likely was minted in Rome, and may be sourced to any large, urban Hellenistic or Roman city in Syria, including Apamea, Palmyra, Dura Europos, or Bosra.  The settings of both Defendant Properties 6 and 7 have fine pierced metal work that gives an appearance similar to lace.  The settings are similar to known 3rd century Roman settings of mounted coins and the pattern is referred to as a "pelta."  It is attested on coins of the same period as Gordian III.  There are at least five other coins of Gordian III that are known to have been mounted as jewelry.  The matching settings of Defendant Properties 6 and 7 suggests that they were made as a set.

59.     The necklace of Defendant Property 7 was found by experts to be nearly identical to a necklace excavated at Dura Europos and now held at a U.S. art gallery ("U.S. Art Gallery 1"). Defendant Property 7 and the necklace now at U.S. Art Gallery 1 share nearly identical chains and suspension loops.  Further, the clasp of U.S. Art Gallery 1's necklace is bronze and shows evidence of corrosion in the form of blue-green chlorides commonly called "bronze disease."  The clasp of

Defendant Property 7 appears to have spots of green suggesting that it too suffers from bronze disease.  The necklace now at U.S. Art Gallery 1 was found in a hoard of coins and jewelry.  The coins were silver and the latest dated to the time of Roman Emperor Volusian (215-253 A.D).

60.    The similarity between the necklace of Defendant Property 7 and the necklace excavated at Dura Europos, which is at U.S. Art Gallery 1, leads experts to conclude that both were made in the same workshop, and that Defendant Property 7 was also found at Dura Europos. A confidential source obtained an additional picture of a set of antiquities that included Defendant Properties 6 and 7 from intermediaries in Southern Turkey.  The source revealed that the picture was used by a Syrian antiquities trafficker to market the items for sale.  The source further revealed that Abu Layth attempted to facilitate this sale on behalf Abu Sayyaf.

61.    Defendant Properties 6 and 7 are each estimated to be worth approximately $50,000.

\*    \*    \*

62.    ISIL has controlled much of the territory in Syria and Iraq and extorts antiquities excavators working in ISIL-controlled territory.  Images of all of the Defendant Properties were found on electronic media of Abu Sayyaf, who was the President of ISIL's Antiquities Department prior to being killed in a U.S. operation.  Additionally, based on their historical characteristics, the Defendant Properties were excavated from areas under ISIL control.  Other documents on Abu Sayyaf's hard drive indicate that Abu Sayyaf, on behalf of ISIL, received at least 20% of the proceeds of items excavated in ISIL-controlled areas and in some instances personally sold the archeological items.  These transactions were often in U.S. dollars.  Based on the previously described evidence, the Defendant Properties are subject to forfeiture.

## COUNT ONE -- FORFEITURE
### (18 U.S.C. § 981(a)(1)(G)(i))

63.     The Government re-alleges and incorporates by reference paragraphs 1 through 62 as if fully set forth herein.

64.     ISIL is an entity or organization engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5).

65.     Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), all assets, foreign or domestic of any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism (as defined in § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization, is subject to forfeiture.

66.     As a result, each of the Defendant Properties is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as a foreign asset of ISIL, and as a foreign asset affording ISIL a source of influence.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant

Properties as described above; that due notice be given to all parties to appear and show cause why

the forfeiture should not be decreed; that judgment be entered declaring that the Defendant

Properties be forfeited to the United States of America for disposition according to law; and that

the United States of America be granted such other relief as this Court may deem just and proper,

together with the costs and disbursements of this action.


Dated: December 6, 2017
      Washington, DC

                    Respectfully submitted,

                    JESSIE K. LIU
                    United States Attorney

                    ARVIND K. LAL
                    Assistant United States Attorney
                    Chief, Asset Forfeiture & Money Laundering
                    Section

By:           /s/
                    ZIA M. FARUQUI, D.C. Bar 494990
                    DEBORAH CURTIS,
                    BRIAN P. HUDAK
                    Assistant United States Attorneys
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7566 (main line)

                    *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Randy Combs, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Amended Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and government representatives, and that everything represented herein is true and correct.

Executed on this 6th day of December, 2017.


_____/s/_____
Randy C. Combs
Special Agent
Federal Bureau of Investigation